[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15 2007
THOMAS K. KAHN
CLERK

_____

No. 06-16319
Non-Argument Calendar

_____

D. C. Docket No. 99-00237-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN ANDREW CAUSEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(June 15, 2007)**

Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Steven Andrew Causey appeals his 24 month sentence for violating a

condition of his term of supervised release–specifically, for using a controlled

substance in violation of a condition of his supervision. We conclude that the district court did not err when it overruled his objection to the introduction of testimony as to the specific quantities of steroids that had been found in his specimen, as the government had provided Causey with a copy of the positive laboratory report prior to his revocation hearing. Moreover, even assuming the government's report should have disclosed the specific quantities of steroids that had been found in his specimen, the district court did not abuse its discretion in revoking Causey's term of supervised release, because Causey failed to show that the court's decision to do so was based on clearly erroneous findings of fact or an improper application of law. Accordingly, we AFFIRM.

## I. **BACKGROUND**

In 2000, Causey was convicted of attempting to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846. Causey's criminal conduct was subject to a minimum mandatory sentence of ten years. However, the government filed a motion pursuant to U.S.S.G. § 5K1.1 seeking a downward departure below ten years, which the court granted. Ultimately, Causey was sentenced to 78 months imprisonment, followed by five years of supervised release. A condition of Causey's term of supervised release was that he not

illegally possess a controlled substance. Causey did not appeal either his conviction or his sentence.

Causey was released from prison in May 2005, and began the period of supervised release on 27 May 2005. On 2 October 2006, a warrant was issued for Causey on the basis that he violated the aforementioned condition of supervision. The warrant alleged the following.

> **Mandatory Condition - The defendant shall refrain from any unlawful use of a controlled substance.** On August 25, 2006, a urine specimen was collected from Causey and submitted to STL Laboratories for testing. The results, which were received on September 25, 2006, indicated the specimen was positive for the anabolic steroid Nandrolone and the drug's associated metabolites 19-Norandrosterone, 19-Noretiocholanolone, and 19-Norepiandrosterone. Nandrolone is a Schedule III controlled substance and requires a prescription in the United States. Causey denied ever using anabolic steroids and reported that he does not have a prescription for any anabolic steroids.

R1-118. As a result, the probation officer recommended that Causey's term of supervision be revoked. Causey was arrested and ordered to detention pending a revocation hearing.

On 6 November 2006, the government filed an emergency motion for a continuance and special setting. In its motion, the government stated that the original probation revocation proceeding had been set for 23 October 2006, but because Causey's counsel objected to the admissibility of the Scientific Laboratory

3

Testing Report on the ground that the specimen had actually been tested by Aegis Laboratory–working under contract with STL–Causey's case had been continued until 7 November. Subsequently, the government had obtained the original lab report from Aegis, which showed the results of the specimen to be positive, and had provided a hard copy of the report to Causey's counsel, in hopes of obtaining a stipulation. The government had further explained that without a stipulation from Causey, the testing chemist from Aegis would have to be brought to Savannah to testify. Causey's counsel refused to stipulate to the contents of the report, and advised that live testimony from the chemist would be required. For these reasons, the government sought a continuance of the 7 November hearing and a special setting of the new hearing date, with notice, to afford it a reasonable opportunity to bring the chemist from Tennessee to Savannah to testify as to the contents of the lab report. The district court granted the government's motion for a continuance.

Prior to the revocation hearing, the government submitted a copy of the specimen report– a copy of which was provided to Causey– revealing that Causey had tested positive for Nandrolone and the drug's associated metabolites 19-Norandrosterone, 19-Noretiocholanolone, and 19-Norepiandrosterone. The report further revealed that the screen cut off for Nandrolone was 10ng/mL, and the three associated metabolites were confirmed at cutoff 10ng/mL each. Nevertheless, the

4

"quantity" section of the report was blank. The report was certified by Dr. Timothy Robert.

At the revocation hearing on 20 November 2006, David Paga, the United States Probation Officer who was responsible for the supervision of Causey, first testified that on 2 August 2006, he had received information from an individual in Coffee County indicating that Causey was using steroids. Paga testified that he had noticed "a remarkable difference in Mr. Causey's size from the time he was on bond until the time he was . . . arrested on the supervised release warrant." R2 at 6. Paga testified that on 25 August 2006, Causey had tested positive for the unlawful use of steroids. Paga stated that, when presented with the positive test results, Causey first said that he did not take any steroids, and later said that he had been prescribed testosterone for impotency. Paga also testified that Causey never presented a prescription for testosterone. Paga testified that Causey's specimen had been submitted to STL for the usual controlled substances and was then submitted to a separate laboratory called Aegis Laboratories for steroid testing. Paga testified that Nandrolone is primarily used for body building.

Dr. Timothy Robert, laboratory director at Aegis Sciences, then testified as an expert in the filed of forensic toxicology. He testified that "the testing performed on the specimen indicated the presence of three distinct metabolites of

Nandrolone, which are commonly encountered in situations where a person has either used Nandrolone or a Nandrolone precursor." Id. at 16. The government further asked, "would you tell us something about the concentrations you detected here in this sample? Were they high, low, could you make a determination?" Id. at 17. Dr. Robert stated:

> Well, I need to preface these comments with a fact that we do not report quantitative results on our test results, because these methods have not been validated for quantitative purposes. And, of course, urinary testing doesn't really benefit significantly from providing quantitative results in most cases. But I think in this particular case, it is fair to say that because of the fact that we had to go back and re-analyze the sample with a rather large dilution factor that it is quite clear that there were very large concentrations of all three of these metabolites present in the urine specimen.

Id. at 17-18. Causey did not enter an objection at this time. The government then sought Dr. Robert's expert opinion by asking him:

> [t]he concentration you observed and the dilution factor you had to use . . . would you characterize those concentration levels as consistent or inconsistent with any accidental contamination ingestion, and why?

Id. at 18.

Causey's counsel objected, arguing that the disclosed copy of the report had a category for quantity on it, but that it was blank. Thus, Causey's counsel objected to Dr. Robert testifying to anything beyond that which was contained in the report. Causey's counsel did not identify this as a constitutional or due process

6

objection at this point in the hearing, nor did it refer to Fed. R. Crim. P. 32.1. The district court overruled the objection, and directed Dr. Robert to answer the question. Dr. Robert responded that the observed concentrations were inconsistent with those seen in cases of accidental contamination, or contamination of a supplement product.

On cross-examination by Causey, Dr. Robert admitted that it was possible to test positive for the three metabolites of Nandrolone without having injected the parent drug, Decadron. Dr. Robert also testified that the ingestion of the precursors could lead to a positive test result. Dr. Robert also stated that vitamin substances have tested positive for the precursors of Nadrolone. Dr. Robert testified that in other instances he had found traces of anabolic steroid precursors as non-labeled ingredients in sleep-aids, vitamins, and dietary supplements. Dr. Robert also indicated that the precursors are not illegal throughout the world, and that many dietary supplements are manufactured outside the United States in facilities where cross-contamination may occur. Dr. Robert also testified that there are published accounts indicating that Nandrolone could be produced in the human body, and speculating that the consumption of pork may cause an increased presence of metabolite of Nandrolone in the body.

Dr. Robert explained on cross-examination that the quantity category in the specimen report was blank because his laboratory did not put quantities for positive test results of Nandrolone. Dr. Robert testified that the cutoff amount referred to a threshold amount and that any amount over 10 nanograms per milliliter for the three metabolites of Nandrolone would read as a positive test result. At that point in the cross-examination, Dr. Robert stated that he did in fact have with him at the hearing specific numerical data with respect to the three metabolites found in the specimen.

Upon hearing this testimony, Causey's counsel moved to exclude any testimony regarding the quantitative results of the tests, on the basis that the information had not been previously disclosed to Causey. However, Causey's counsel still did not refer to this as a due process argument or an objection based on Rule 32.1. The government responded that the defendant had compelled it to bring Dr. Robert to the hearing to testify, and the fact that Dr. Robert knew more than what was in the report was simply a benefit of having a live expert witness. Ultimately, the district court overruled Causey's motion to exclude the quantitative data and its objection to Dr. Robert's testimony.

On redirect by the government, Dr. Robert first testified the World Anti-Doping Agency (WADA) has set a threshold level of two nanograms to show a

positive test result for Nandrolone in males. Dr. Robert stated that his laboratory considers ten nanograms a positive test result for Nandrolone, thus, the threshold level at the laboratory is five times that of WADA. The government then asked Dr. Robert to describe the quantitative information collected in Causey's specimen. Causey's counsel again objected, "on the basis of Rule 16," that the information had not been previously provided to them. R2-34. The government responded that Causey's counsel had opened the door to that evidence, by asking about the specific data on cross-examination. The district court overruled the objection.

Dr. Robert then testified that examination of the sample provided by Causey revealed approximately 4,400 nanograms per milliliter of 19-Norandrostenedione, approximately 727 nanograms per milliliter of 19-Noretiocholanolone, and approximately 328 nanograms per milliliter of 19-Norepiandrosterone. Dr. Robert asserted that these results would not be consistent with inadvertent incidental exposure. Dr. Robert explained that these were not trace concentrations, but were substantially elevated concentrations. The government rested.

Causey presented one witness, Mark Batten, Causey's brother-in-law, who testified that Causey lived with him for a period in 2005, and that they lifted weights together nearly every day for an hour to two hours. Batten testified that he

and Causey took more than 15 different types of vitamins and supplements, which they purchased at GNC offline or online, to try to stay fit and maintain health.

In his closing argument at the hearing, Causey's counsel stated that Causey did not dispute the presence of Nandrolone in his specimen, only whether the presence of the controlled substance was of an intentional or accidental nature, or if the sample itself had been contaminated.

The district court noted that, according to U.S.S.G. § 7B1.4, application note 4, because Causey's original sentence had been the result of a downward departure an upward departure was arguably warranted for his sentence for revocation of supervised release. The district court found that level of ingestion of Nandrolone in this case was "wildly in excess" of the minimum required to account for any accidental ingestion or incidental contamination. Id. at 52. Thus, the court found that Causey violated the terms and conditions of supervised release by ingesting a Schedule III controlled substance. The court offered Causey an opportunity to speak in mitigation, but he refused to make a statement. The court again noted that Causey had received a substantial downward departure on his original sentence, and then sentenced him to an additional 24 months imprisonment, followed by a new three year term of supervised release. Causey timely appealed.

## II. **DISCUSSION**

On appeal, Causey argues that the district court abused its discretion by admitting and relying upon testimonial evidence that had not been provided to him prior to the hearing in violation of Fed. R. Crim. P. 32.1, and due process. Specifically, Causey argues that the government was required to provide notice of–and produce all–evidence against him, including the actual quantities of Nandrolone metabolites found in his specimen. Causey also contends that there was ample evidence in the record to support a conclusion that he may have tested positive for metabolites through inadvertent or incidental exposure or consumption. Causey requests that the revocation of supervised release be reversed and remanded, and the evidence relating to the specific quantities of Nandrolone be excluded. Causey asserts that the applicable standard of review for all of these issues is abuse of discretion.

When a defendant objects to a district court's revocation of supervised release, that will be reviewed under an abuse of discretion standard. United States v. Copeland, 20 F.3d 412, 413 (11th Cir. 1994) (per curiam). A court abuses its discretion when its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." United States

v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005) (citation omitted), cert. denied, 126 S.Ct. 1809 (2006).

By contrast, when a defendant does not raise an objection before the district court initially, his claim will only be reviewed for plain error. United States v. Olano, 507 U.S. 725, 731, 113 S. Ct. 1770, 1776 (1993). To establish plain error, the defendant must prove: (1) error; (2) that is plain; and (3) that affects substantial rights. Id. at 732, 113 S. Ct. at 1776 (citation and quotations omitted). We will correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 732, 113 S.Ct. at 1776 (citation and quotations omitted). Because Causey objected to Dr. Robert's testimony regarding the quantity of steroids present in his sample at the revocation hearing, he preserved his objection to the alleged failure to timely disclose the specific quantity of steroids present in his specimen, and to the testimony itself. While Causey may not have preserved a due process challenge or an objection based specifically on Rule 32.1, it is not necessary for us to decide that question because, as discussed below, under either an abuse of discretion or plain error standard of review, his claim does not succeed.

"Defendants involved in revocation proceedings are entitled to certain minimal due process requirements." United States v. Frazier, 26 F.3d 110, 114

(11th Cir. 1994) (citation omitted). In the parole revocation context, the Supreme Court has held that due process requires, among other things, disclosure of the evidence against the person. Morrissey v. Brewer, 408 U.S. 471, 487-89, 92 S. Ct. 2593, 2604 (1972). Following Morrissey, this rule was codified in Federal Rule of Criminal Procedure 32. 1(b), providing in relevant part, that the defendant in a revocation hearing is entitled to "disclosure of the evidence against the person." Fed. R. Crim. P. 32.1(b)(2)(B). We have extended the "protections granted those facing revocation of parole [to cover] those facing the revocation of supervised release." Copeland, 20 F.3d at 414 (citation omitted).

In this case, it is clear that the government complied with Fed. R. Crim. P. 32.1 and due process to the extent that it provided Causey a copy of the Aegis Laboratory report prior to the revocation hearing. This report confirmed that Causey's specimen tested positive for Nandrolone, at a threshold level of ten ng/mL.

It is true, as Causey points out, that the government failed to disclose, prior to the revocation hearing, the evidence of the specific quantities of Nandrolone and its metabolites found in Causey's specimen– quantities which had not been reported on the laboratory report. Nevertheless, we affirm, because Causey fails to

13

demonstrate that the decision to revoke his term of supervised release was an abuse of discretion or plain error. See Baker, 432 F.3d at 1202.

First, the government sought revocation of Causey's term of supervised release on the grounds that he engaged in the unlawful use of a controlled substance. It did not rely on any specific test quantity for seeking the revocation. Second, the transcript from the revocation hearing shows that during the government's direct examination of Dr. Robert, the government did not ask him to testify to the exact levels of steroids discovered in the specimen. The transcript demonstrates that the government asked him to render an expert opinion regarding the test results based on the data contained in the report, asking, "would you tell us something about the concentrations you detected here in this sample. Were they high, low, could you make a determination?" See R2 at 17. Even after Causey objected and the court overruled his objection, Dr. Robert testified as to his expert conclusion that, based on the ten nanograms per milliliter threshold, the observed concentrations were inconsistent with contamination of a supplement product.

It was not until Causey's cross-examination of Dr. Robert that Dr. Robert was asked whether he had with him confirmation data with respect to the specific levels of the three metabolites found in Causey's specimen. Causey's counsel asked this question immediately after Dr. Robert testified that his usual laboratory

14

practice was *not* to put the specific quantities in the report, and that the report only revealed whether the specimen tested above the cutoff amount. Causey then moved to prevent Dr. Robert from testifying about this data, and the district court denied the motion. As a result, on redirect, the government asked, and Dr. Robert testified, as to the exact levels of the metabolites observed in Causey's specimen.

Even assuming the government committed some error in failing to disclose the specific quantity of steroid found in Causey's specimen, we conclude that the district court did not abuse its discretion or plainly err in revoking his term of supervised release. See Baker, 432 F.3d at 1202. It is undisputed that the laboratory report demonstrated that Causey's specimen tested positive for a controlled substance, which he was prohibited from ingesting (in any amount) according to his conditions of supervised release. The minimum "passing" threshold levels reported on the laboratory report were five times greater than the levels prohibited by the World Anti-Doping Agency. Furthermore, Paga testified that he noticed a "remarkable difference" in Causey's size, and that he had been told by an informant that Causey was using steroids. See R2 at 6. These facts demonstrate by a preponderance of the evidence that Causey ingested a prohibited controlled substance, in clear violation of the conditions of his supervision.

### III. **CONCLUSION**

Based upon the record in this case and our discussion above, we cannot conclude that the district court abused its discretion.  Accordingly, we **AFFIRM**.